BILAL A. ESSAYLI
United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
ROGER A. HSIEH (Cal. Bar No. 294195)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
MATT COE-ODESS (Cal. Bar No. 313082)
Assistant United States Attorney
     1100/1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0600/8957
     Facsimile: (213) 894-6265
     Email:     Roger.Hsieh@usdoj.gov
                Matt.Coe@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:20-00536-DMG-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT PERCY DEAN ABRAMS |
| v. | Hearing Date: April 23, 2025 |
| PERCY DEAN ABRAMS, ET AL., | Hearing Time: 11:00 a.m. |
| Defendant. | Location:     Courtroom of the Hon. Dolly M. Gee |

   Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Roger A. Hsieh and Matt Coe-Odess, hereby files its sentencing position regarding defendant PERCY DEAN ABRAMS.

//

//

//

The government's sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Investigation Report and Sentencing Recommendation, and any other evidence and argument as the Court may permit.

| | |
|---|---|
| Dated: April 9, 2025 | Respectfully submitted, |
| | BILAL A. ESSAYLI<br>United States Attorney |
| | LINDSEY GREER DOTSON<br>Assistant United States Attorney<br>Chief, Criminal Division |
| | _____/s/_____<br>ROGER A. HSIEH<br>MATT COE-ODESS<br>Assistant United States Attorney |
| | Attorneys for Plaintiff<br>UNITED STATES OF AMERICA |

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Defendant PERCY DEAN ABRAMS was convicted at trial after the evidence established that he willfully received hundreds of thousands of dollars in illegal kickbacks in exchange for recruiting and referring people -- most of whom were not dying -- for purported hospice care.  Defendant played an indispensable role in the Medicare fraud scheme perpetrated by co-defendant Nita Palma through Magnolia Gardens Hospice and C@A Hospice that defrauded Medicare out of millions of dollars.  As a marketer for Magnolia Gardens Hospice, C@A Hospice, and other hospices, defendant Abrams received money for referring patients for hospice care on a per-patient basis, regardless of whether the patients were terminally ill and in fact eligible for hospice, and despite knowing that it was illegal to receive such remunerations.

From August 2015 to March 2020, defendant Abrams received approximately 182 checks totaling $421,823.16 in illegal kickbacks for referring people to hospices, including 49 checks from co-defendant Palma totaling $147,298.92 for referrals to Magnolia Gardens Hospice and C@A Hospice.  Defendant Abrams' actions not only caused financial harm to the public, but also risked harms to people placed on hospice who could be prevented from receiving treatment for real medical conditions.

The government recommends that the Court sentence defendant Abrams to 27 months' imprisonment -- at the low end of the resulting Guidelines' range -- followed by three years' supervised release, and a special assessment of $600.  Such a sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense,

promote respect for the law, provide just punishment for the offense, and provide deterrence to similar criminal conduct.

## II. FACTUAL BACKGROUND

### A. Procedural Background

On October 30, 2020, defendant Abrams was charged with six counts of receiving illegal remunerations for health care referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A). (Dkt. 1.) Co-defendant Palma was charged with 12 counts of health care fraud, in violation of 18 U.S.C. § 1347(a)(2), 2(b), and 16 counts of paying illegal remunerations for health care referrals, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A). (Id.) Defendant Abrams and co-defendant Palma were both convicted on all counts on December 11, 2024, after a jury trial.

### B. Offense Conduct

As the evidence proved at trial and as recounted in the Presentence Investigation Report ("PSR") (Dkt. 246, ¶¶ 8-27), from August 2015 to March 2020, defendant Abrams received 182 checks totaling $421,823.16 for illegally referring patients to hospices. Defendant Abrams, who testified during trial, did not dispute that he knowingly received these checks in exchange for referring patients to hospice on a per-patient basis. Defendant Abrams, however, disputed that he acted with the general understanding that his conduct was unlawful and instead claimed at trial that he only knew his conduct was illegal _after_ he was prosecuted for the crime.

The evidence at trial, however, proved otherwise. In a covertly recorded video, defendant Abrams admitted to an undercover agent that it was "illegal" for him to pay someone for referring a patient to hospice, and defendant Abrams instructed, "Don't ever utter that to

2

nobody." (Tr. Ex. 602.) Defendant Abrams further stated that they would "put him under the jail" if they knew he was offering illegal kickbacks for healthcare referrals.

At trial, defendant Abrams testified that he knew it was illegal to <u>pay</u> kickbacks for healthcare referrals, but he denied knowing that it was illegal to <u>receive</u> kickbacks for healthcare referrals. But defendant Abrams' testimony was again belied by the evidence. In the aforementioned undercover video recording, an individual working with the government asked defendant Abrams if she would get in trouble for receiving payment for making a healthcare referral, to which defendant Abrams said, "No, no, no, I'm giving you cash money. I'm not going to write you no check. I'll give you cash money."

The government also introduced false statements defendant Abrams made to law enforcement during a voluntary interview. These statements, which were made before defendant Abrams was charged in this case, demonstrated that defendant Abrams knew his conduct was unlawful.

For example, defendant Abrams initially did not want to admit that he was a marketer for Magnolia and C@A hospices, and instead claimed he was a "consultant," even though witnesses testified that there was no evidence defendant Abrams ever did any consulting work or gave any advice to Magnolia or C@A. (Tr. Ex. 601.) Next, defendant Abrams denied getting paid on a per patient basis and instead claimed that he received a salary of roughly $300 dollars. But Esmerelda Gamayon, who worked in payroll for Magnolia and C@A, testified that defendant Abrams did not receive a salary, but rather was paid on a per patient basis. Defendant Abrams also stated in his initial interview with law enforcement that he did not know exactly

3

how Magnolia and C@A paid him, but evidence showed that defendant Abrams would email co-defendant Palma a list of his client referrals. Moreover, Ms. Gamayon testified that she witnessed defendant Abrams and co-defendant Palma argue over how much defendant Abrams was owed.

There was also evidence that showed defendant Abrams lied to prospective beneficiaries to convince them to enroll in hospice. For example, in an undercover video, defendant Abrams told an undercover agent that his mother did not need to be dying to enroll in hospice. (Tr. Ex. 602.) However, defendant Abrams told law enforcement in a voluntary interview that he knew hospice was for people who were at the end-of-life stages.

The government also introduced evidence showing that defendant Abrams was the marketer for individuals who enrolled in Magnolia hospice without knowing that they had enrolled in hospice. For example, defendant Abrams was listed as the marketer for an individual named T.N., even though T.N. testified that she did not understand or intentionally enroll in hospice. Although T.N.'s patient intake sheet listed several diagnoses, T.N. testified that she did not have these diagnoses. T.N. and her doctor, Dr. Demirozu (whose name also appears, albeit badly misspelled, on the patient intake sheet), both testified that they had never seen this patient intake sheet before.

**III. THE GOVERNMENT CONCURS WITH PROBATION'S OFFENSE LEVEL**

The United States Probation & Pretrial Services Office ("USPO") issued a PSR on March 19, 2025, (Dtk. 245, PSR) and a Revised PSR on April 7, 2025 (Dkt. 249, Revised PSR). The PSR calculated a total offense level of 18, and a Criminal History Category of I, resulting in an advisory guideline range of 27 to 33 months. (PSR ¶ 112.)

4

1  The government does not object to the PSR's findings or Guidelines'
2  calculation.
3       Defendant Abrams was convicted of violations of 42 U.S.C.
4  § 1320(a)7b(1)(A) and has a base offense level of 8.  (PSR ¶ 39.)
5  The evidence at trial -- including Exhibit 207 and defendant Abrams'
6  own testimony -- established that he received $421,823.16 in illegal
7  kickbacks in exchange for referring people for purported hospice
8  care.  (Exhibit 207; PSR ¶¶ 27, 40.)  Thus, a 12-level enhancement
9  for the value of the bribe exceeding $250,000 is applicable under
10 U.S.S.G.  § 2B1.1(b)(1)(G).  If defendant Abrams qualifies as a
11 zero-point offender, his total offense level is 18.  (PSR ¶ 53.)
12      Defendant Abrams filed a notice of objection to the PSR and
13 requested a two-level downward departure to the offense level based
14 on the argument that defendant Abrams was a minor participant in the
15 criminal activity.  (Dkt. 248.)  The government agrees with the USPO
16 and the reasons articulated in its Addendum to the PSR defendant that
17 defendant Abrams is not entitled to a two-level adjustment for minor
18 role because he was an average co-participant in the instant offense
19 of receiving illegal remunerations.  (Dkt. 250.)  First, defendant
20 Abrams was not charged in the health care fraud scheme, and he is not
21 being held accountable for amounts co-defendant Palma paid to other
22 marketers or the overall loss to Medicare based on the patients
23 defendant Abrams referred.  Therefore, defendant Abrams' culpability
24 should be evaluated in the context of the charged counts of receiving
25 illegal remunerations rather than the entire scope of co-defendant
26 Palma's healthcare fraud scheme.  (Id.)  Defendant Abrams' total
27 offense level of 18 for receiving kickbacks is significantly less
28 than level 33 calculated for defendant Palma in the health care fraud

scheme with a loss of more than $10.5 million (Palma PSR, Dkt. 252, ¶¶ 45, 53), and thus a mitigating role adjustment is not warranted. See, e.g., U.S.S.G. § 3B1.2 Commentary n.3(B) ("no reduction for a mitigating role is warranted because the defendant is not substantially less culpable than a defendant whose only conduct involved" the receipt of kickbacks).

Second, despite defendant Abrams' contention that he was "acting at the directions of co-defendant Palma," (Dkt. 248), defendant Abrams recruited patients for, and was paid by, nine additional hospices that were not related to defendant Palma. (Dkt. 250).

**IV. ARGUMENT**

The government recommends that the Court sentence defendant Abrams to a low-end Guidelines' sentence of 27 months' imprisonment, followed by three years' supervised release, and a special assessment of $600. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).

**A. History and Characteristics of the Defendant**

Defendant Abrams has multiple, old criminal convictions, and the current convictions appear to be his first involving health care and kickbacks. As a juvenile, defendant Abrams was convicted of second-degree murder. The PSR notes that defendant Abrams shot and killed an unarmed high school student with a shotgun when the victim began to walk away. (Revised PSR ¶ 58.) Defendant Abrams sustained convictions for second degree murder, carrying a loaded firearm in public, sale/transport of controlled substances, and receiving stolen property from around 1967 through 1985. (Revised PSR ¶¶ 59-61.) To defendant Abrams' credit, the Revised PSR reflects that his last

6

arrest was more than 30 years ago in 1993. (Revised PSR ¶ 71.) The Revised PSR, however, demonstrates that defendant Abrams currently does not appear to acknowledge responsibility for his crimes, often making excuses for his criminal conduct. (Revised PSR ¶¶ 58-61.) For the instant offense, defendant Abrams continues to deny he committed the offense -- despite ample evidence to the contrary -- stating, "I never knew being paid 'by person' was wrong." (Revised PSR ¶ 34.) Defendant Abrams' failure to accept responsibility for his actions support a sentence within the Guidelines' range. In mitigation, unlike defendant Palma, defendant Abrams may have stopped receiving kickbacks after he was arraigned in this case. Defendant Palma, on the other hand, continued to commit health care fraud while awaiting trial in this case and is deserving of a sentence at or towards the high-end of the Guidelines' range.

### B. Nature and Circumstance of the Offense

The nature and circumstances of the offense support a sentence of 27 months' imprisonment. See 18 U.S.C. § 3553(a)(1). The defendant knowingly and willfully engaged in criminal conduct for several years, and he received over $420,000 as a result of his criminal behavior. By receiving illegal kickbacks for healthcare referrals, defendant Abrams not only allowed co-defendant Palma's larger fraud scheme to work, but defendant Abrams was also responsible for several vulnerable, elderly people being signed up for hospice without their knowledge or understanding. Although defendant Abrams apologized for his actions when he testified, he was unwilling to take responsibility for his actions. Even after he was convicted of all six counts by a jury of his peers, defendant Abrams

continues to deny knowing that his conduct was wrong at the time. (PSR ¶ 34.)

### C. Need for Adequate Deterrence

Schemes like the one perpetrated by defendant Abrams and co-defendant Palma threaten the viability of the Medicare programs by increasing costs and jeopardize Medicare and its ability to provide much-needed health care benefits to vulnerable populations, including the elderly and the disabled. Deterrence is sorely needed to stem such fraud against Medicare and state government programs. Hospice fraud is a significant problem for the state and federal government in California, and in particular in Los Angeles County.[1] In 2022, nationwide Medicare hospice expenditures totaled $23.7 billion,[2] with more than $3 billion paid in California in 2020.[3] The State of California has flagged the proliferation of hundreds of hospices in recent years in Los Angeles County, where "networks of individual perpetrators in Los Angeles County are engaging in a large and organized effort to defraud the Medicare . . . hospice program[]. Such fraud places at risk the extremely vulnerable population of hospice patients."[4] The State of California estimated 2019 Medicare

---

[1] See generally 'Large-scale fraud' and lax oversight plague California's hospice industry, audit finds, L.A. TIMES, Mar. 29, 2022, available at https://www.latimes.com/california/story/2022-03-29/fraud-lax-oversight-california-end-of-life-hospice-industry-audit-finds.

[2] Medicare Payment Advisory Committee, March 2024 Report to Congress, at 261, available at https://www.medpac.gov/wp-content/uploads/2024/03/Mar24_MedPAC_Report_To_Congress_SEC-3.pdf.

[3] Auditor of the State of California, California Hospice Licensure and Oversight, Report 2021-123 (March 2022), at 11, available at https://www.auditor.ca.gov/pdfs/reports/2021-123.pdf.

[4] Id. at iii.

8

overbilling for hospice in Los Angeles County at $105 million.[5] The magnitude and particularity of the fraud to the Central District of California is evidenced by the fact that, as of 2019, Los Angeles County had 818 hospices, while the states of New York and Florida combined had only 87 hospices.[6]

The U.S. Department of Health and Human Services, Office of Inspector General, has identified that "[c]ommon [hospice] fraud schemes involve inappropriately enrolling beneficiaries," which includes "paying recruiters to target beneficiaries who are not eligible for hospice care"; this is the exact sort of scheme the defendant participated in here.  This conduct not only defrauds the government, but also risks harming patients because "Medicare hospice does not pay for curative treatment" so a beneficiary may be "unwittingly forgoing needed treatment" when enrolled in hospice through kickbacks.[7]

A sentence of 27 months is appropriate to deter others from engaging in similar illegal conduct.  Individuals who are engaged in criminal conduct like defendant Abrams make a calculated decision that the risk of being caught and punished is worth the illicit proceeds that they can obtain from federal government benefit programs.  As stated by the drafters of 18 U.S.C. § 3553(a), general deterrence is particularly important for white collar criminals in order to dissuade actors that small fines or low sentences can be

---

[5] Id. at 25.

[6] Id. at 20.

[7] U.S. Department of Health and Human Services, Office of Inspector General, Vulnerabilities in the Medicare Hospice Program Affect Quality Care and Program Integrity: An OIG Portfolio, OEI-02-16-00570, at 10, available at https://oig.hhs.gov/oei/reports/oei-02-16-00570.pdf.

9

dismissed as simply a "cost of doing business." S. Rep. No. 98-225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259. A sentence of 27 months will serve to affect that calculus and cause individuals to decide that the money to be gained from Medicare is not worth the risk of incarceration.

### D.   Need to Avoid Unwarranted Disparities

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants.  One way of doing so is to sentence defendants within the Guidelines' range.  See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity' . . . ."); Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.").  Although defendant Palma's actions support a sentence towards the high-end, a sentence at the low-end of the Guidelines' range for defendant Abrams, avoids an unwarranted disparity with similarly situated defendants.

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a low-end Guidelines' sentence of 27 months' imprisonment, followed by a three-year term of supervised release; and a $600 special assessment.