Ian Wallach (SBN237849)
Law Office of Ian Wallach, PC
5777 West Century Blvd., Suite 750
Los Angeles, CA 90045
Phone: (213) 375-0000 | Fax: (213) 402-5516
iwallach@wallachlegal.com

*Attorney for Defendant*,
Percy Abrams

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>NITA ALMUETE PADDIT PALMA, AKA "NITA CATBAGAN," AND PERCY DEAN ABRAMS,<br><br>  Defendants | CASE NO. 2:20-cr-00536-2-DMG<br><br>DEFENDANT PERCY ABRAMS' SENTENCING POSITION PAPER<br><br>DATE: AUGUST 5, 2025<br>TIME: 11:00 A.M.<br>COURT: 8C<br><br>*Before The Hon. Dolly M. Gee* |

To The Honorable Dolly M. Gee, United States District Judge; The United States Attorney's Office And Its Attorneys Of Record, Assistant United States Attorney Roger Hseih And Assistant United States Attorney Matthew Coe-Odess; And United States Probation Officer Elizabeth Morony:

Defendant Percy Abrams (hereinafter "Mr. Abrams"), by and through counsel, hereby files Mr. Abrams' Sentencing Position Paper.

1
DECLARATION

MEMORANDUM

I. INITIAL STATEMENT REGARDING MR. ABRAMS' COMPETENCY

Mr. Abrams is a 75-year-old-man of African descent suffering from Alzheimer's Disease (which set in near the commencement of this case). Under normal circumstances, defense counsel would have been able to retain a neurologist to review the MRI data and other medical records (which are in defense counsel's possession) and provide a professional opinion as to the progress of Mr. Abrams' Alzheimer's Disease and related dementia.

Unfortunately, at present, Courts are not able to provide compensation for such experts to perform these services. (See "Funding Crisis Leaves Defense Lawyers Working Without Pay", https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay (last accessed July 20, 2025). Counsel has been aware of this issue since June 25, 2025. Counsel conferred with potential experts (and had previously done so as well), but none are willing (or should be) to work without knowing if and when they will be compensated.

There is a procedure to have the Bureau of Prisons take a defendant into custody and make a competency determination under 18 USCS § 4241. However, the undersigned counsel has experience in this process. As of November, 2022, in a separate matter[1] (that is filed under seal because of privacy concerns), the Court was informed that the Bureau of Prisons had *only one forensic psychologist* in its

---

[1] Should the Court request and Order, the Undersigned Counsel will provide the case number and ECF number referencing this email in an *under seal* filing.

employ, and that he was employed at Butner, and there was a nine-month waiting list for a competency evaluation. Specifically, Dia Boutwell, Ph.D. and member of the American Board of Professional Psychology, sent an email to the CRD in that matter stating "We do not currently have the resources to complete a psychiatric examination. Our only forensic psychiatrist after the end of this month will be at Butner. If they want a BOP psychiatric exam, it will be a nine month wait to get into FMC Butner. I would strongly recommend this evaluation be completed by a community psychiatrist if that is what is required." (Declaration of Ian Wallach ("Wallach Dec., ¶ 2).

      The undersigned counsel assumes this is still the case and cannot retain a community psychiatrist to perform such an evaluation due to the present unavailability of funds described above.[2] Considering Mr. Abrams' age, infirmities, and the law discussed below, submitting him for such consideration at this time does not appear to be in the interests of the Parties or the Court.

      While the undersigned counsel submits that there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to a large extent, the undersigned counsel does not believe that Mr. Abrams is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense (*See* 18 USCS § 4241). Additionally, the Court, the Government, and the

---

[2] While the undersigned counsel believes that Mr. Abrams is capable of understanding his predicament and assisting counsel with his defense, the undersigned counsel lacks the qualifications to make this determination in light of Mr. Abrams' documented mental health ailments.

Department of Probation and Pre-Trial Services has seen Mr. Abrams and interacted with him and should be able to assess his condition using common knowledge – he is confused and elderly and his mental ailments are progressing.

Accordingly, is the undersigned counsel's belief that this matter may proceed to sentencing. However, should the Court have concerns and wish to delay sentencing until funds become available for a psychiatric and/or neurological evaluation and then have this matter proceed to sentencing, the defense does not object to a further extension.

It should also be noted (and the Government would concede) that the diminishment of Mr. Abrams' mental faculties was frequently brought to the attention of the Court and Government, and the undersigned counsel repeatedly requested that the Government take pre-trial depositions of Mr. Abrams pursuant to Fed. R. Crim. Proc. R. 15. (Wallach Dec., ¶ 3).

II. INTRODUCTION

Percy Abrams is a seventy-five-year-old man presently suffering from Alzheimer's Disease (which appears to have onset on or about 2018). Despite sustaining a conviction for a serious offense in his youth (which occurred almost 60 years ago) and having other less substantial convictions through 1985 (a gun conviction at the age of 20 for which he was fined in 1970, a drug sales conviction at the age of 28 in 1978, and a misdemeanor conviction for receipt of stolen property in 1985 (PSR, ¶¶ 59-61), he lived a lawful existence for the next thirty years – a rare feat in contemporary times for one with any similar criminal history.

As regards the present matter, Mr. Abrams has always maintained that he knew that paying people to bring him prospective hospice clients was unlawful, conduct which he began to engage in 2015. He justified this conduct with a belief that he was helping people obtain other services that they needed.

Potentially as early as 2018, he began to become confused, and this has progressed throughout this action. While he has always been aware of the misconduct for which he was charged and oriented as to time and place and able to assist counsel in his defense, it is clear that his illness is highly relevant to his conviction, his PSR interviews, and, ultimately, the sentence he is to receive.

He presently requires full-time medical care. His sole endeavors outside of his home are limited to attending religious services and family events. His present lifespan is unknown. What is known, however, is that his capacity to understand his surroundings and his capacity to function normally is limited and decreasing over time.

Mr. Abrams no longer has sufficient funds for self-sustenance and is forced to rely on the generosity and time of his family and Jeweline Miles, his life partner, to get by. And the costs of his medical treatments are substantial.

Mr. Abrams therefore asks for probationary sentence of three years on each count, to run concurrently. Should the Court determine that a custodial sentence is necessary, Mr. Abrams requests a sentence of one year of home confinement on each count, to run concurrently, followed by a period of supervised release of one year. Such a sentence it comports with the 3553(A) factors.

### III. OBJECTIONS TO THE PRE-SENTENCE REPORT

Mr. Abrams has no additional objections to the Pre-Sentence Report other than that addressed by the Department of Probation and Pre-Trial Services in the Addendum To The PSR filed on April 7, 2025 [ECF 250] and understands and accepts the response to that objection contained in that Addendum.

The above said, Mr. Abrams has always acknowledged that he knew that *paying* people for referrals – a crime for which he was not charged – was unlawful. While such acknowledgement falls short of the requirement for Acceptance of Responsibility (for which he accordingly received no Guideline Range Reduction (PSR, ¶ 48), he asks that the Court consider said acknowledgement when fashioning the sentence.

### IV. PRE-TRIAL SUPERVISION

Mr. Abrams fully complied with his obligations while under pre-trial supervision. (PSR, ¶ 27).

### V. CONDUCT AND CONVICTION

Mr. Abrams (admittedly) signed up individuals for hospice care or hospices owned by co-defendant Nita Palmer. He did so making false representations as to eligibility, with the knowledge that making such representations was unlawful. (PSR, ¶¶ 25-26). Over a five and a 1/2-year period (between August 25, 2015 and March 20, 202) he was paid a total of $421,823.16. (PSR, ¶ 27) (approximately $77,00 per year).

Mr. Abrams never denied knowledge that his conduct of paying individuals for referrals was unlawful. Prior to trial, he always denied knowledge that being

paid on a per-patient commission basis, rather than on a salaried basis, was unlawful.

On December 11, 2024 Mr. Abrams was convicted at trial of six counts of Receiving Illegal Renumeration for a Health Care referral in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) [ECF 1, 226].

VI. TRIAL TESTIMONY

Mr. Abrams testified. His testimony was unexpectedly defiant, confusing, defensive, and bizarre. For example, Mr. Abrams acknowledged that he engaged in illegal conduct in paying people to bring him prospective hospice patients – something he has always admitted to. (Transcript of December 10, 2024 ("TR"):88:19-23 [ECF 263]. But at trial, he testified that he paid individuals directly to sign up for hospice programs – despite the absence of any such evidence provided in by the Government. TR: 90:4-12. Mr. Abrams stated that he thought he was being paid on a salary basis, rather than on a commission basis, despite never making any such representation before during interviews and no such representations ever being provided in the discovery. Mr. Abrams accused the Government of entrapment. (TR 162:12-14). And rather than answering questions posed by the Government, he continually apologized for his behavior (TR 99:10; 109:1, 25; 110:17, 115:21; 116:14; 122:13).

Simply put, his testimony was aberrant to any prior interview he had provided and was fatal to his case.[3]

---

[3] Because of the Attorney-Client privilege, the undersigned counsel is not able to discuss prior conversations or trial preparation with Mr. Abrams. Should the Court

## VII. THE PSR INTERVIEW

While Mr. Abrams was candid during his multiple PSR interviews, it is clear that he was confused and not always able to understand the questions posed. For example (and has the Government has properly identified), he continued to maintain that he never knew his manner of payment was unlawful (the crime for which he was convicted) and was only able to speak of mitigating factors including the difficulties his prospective patients faced obtaining medical care, his lawful reporting of income, his lack of desire to harm anyone, and his accompaniment during food and prayer with the prospective patients he signed up for hospice treatment. (PSR, ¶ 34).[4]

## VIII. LIFE AND CHARACTER

Mr. Abrams' life has not been an easy one. He is an African American man born in 1950. His mother, who he loved dearly, passed when he was sixteen years old. (PSR, ¶ 73). He has/had many siblings – all but three of whom have passed. His two older brothers died shortly after birth. His brothers James and Samuel died at the ages of 70 and 68, respectively. His sister Delores passed at the age of 77. His sister Elnora passed in her 40s. His remaining family is comprised of Charlene

---

or the Government have any inquiry regarding such conversations or preparation, however, it is expected that Mr. Abrams would waive that privilege.

[4] *Id.*

Abrams (age 80) of Inglewood, California, his sister Zelda who lives in Lancaster, CA, and his sister Sabrina who lives in Los Angeles. (PSR, ¶ 74).

As a child, his family provided all basic necessities. However, he was disciplined with corporal punishment. He also witnessed his mother enter into a coma for several weeks when he was a junior in high school. (PSR, ¶ 74). During that same time, his brother James, who he recalls was a "lively person" about to graduate high school, was jumped and cut in the head with a machete, resulting in his incapacity to live independently and his reliance on his family to survive. (PSR, ¶ 76).

At the age of 16, Mr. Abrams shot and killed a home intruder and spent years in custody as a result. But he was able to use this tragedy in a positive manner and attended the University of California, Davis, for two years. (PSR, ¶ 77).

Mr. Abrams has two children from his prior marriage – Percy Abrams, Jr. and Precious Adams – who he raised following his divorce. His ex-wife was a drug-addict who kidnapped his son Percy when Percy was 12 but, due to her addiction, failed to care for him. Mr. Abrams went for 18 months without knowing his son's whereabouts. A caring family would feed Mr. Abrams' son and ultimately called the police allowing for Mr. Abrams to immediately re-unite with his son and ultimately raise him. (PSR, ¶ 79).

Mr. Abrams remarried to Barbara Ward, a nurse who helped raise Mr. Abrams' children. After 22 years of marriage, Ms. Ward died of cancer. (PSR, ¶ 80). The following year he began a consensual relationship with Jeweline Miles, his life partner. (PSR¶ 79). The two fell into financial hardship following his arrest in this matter and they have resided at Ms. Miles' daughter's home in Texas since

that time. As the Court and parties are aware, Ms. Miles attended each day of the trial.

Despite the hardships that he faced, Mr. Abrams lived a lawful existence for at least thirty years prior to the conduct that led to his present conviction.

Mr. Abrams is most proud of these five accomplishments:

First, he has raised two children who are productive and independent individuals and wonderful parents.

Second, he is proud that – from prison – as a young man, he was able to begin, and then continue – to spend two years at University of California Davis.

Third, he is proud of his religious service. He is a child of god and, in his own words, serves him with gladness.

Fourth, he is proud to be a Mason, and ultimately serving as a Grand Master of a Masonic Temple and advancing to the status of Shriner.

Lastly, he is proud that – during his life – he has been surrounded and supported by wonderful friends and family.

## IX.  MEDICAL/MENTAL HEALTH CONDITIONS

The Court is aware of the mental state of Mr. Abrams. He is plagued by several other medical afflictions. He has asthma and COPD as a result of bronchial pneumonia he suffered at age four. He suffers from three herniated discs (his medical records regarding his present pain are available should the court request). He suffers from rheumatoid arthritis. (PSR, ¶ 88). He has had multiple procedures and limited use of one leg.

Since 2018, he has suffered from both dementia and prostate cancer for which he has had multiple procedures (with more scheduled as he is currently under care for this affliction).

And as far as his mental affliction, the PSR notes that he was unable to complete the PSR interview forms without the assistance of Jeweline Miles.

## X. THE IMPACT OF MR. AILMENT'S MEDICAL AND MENTAL HEALTH CONDITIONS ON HIS PROSPECTIVE SENTENCE

### a. A Custodial Sentence Could Be Devastating

Mr. Abrams deserves, clearly, to be punished for his misdoings. But any such punishment should be made in consideration with his present medical and mental health state. And in his case, the stress associated with his present medical condition could have devastating consequences should a custodial sentence issue.

In "Neurobiology of Stress -- The relationship between stress and Alzheimer's disease" (Nicholas J. Justice, Journal of The Institute of Molecular Medicine, University of Texas Health Sciences Center, April 18, 2019) (available at https://doi.org/10.1016/j.ynstr.2018.04.002) (last accessed July 20, 2025), the author summarizes (in the abstract) that:

> Stress is critically involved in the development and progression of disease. From the stress of undergoing treatments to facing your own mortality, the physiological processes that stress drives have a serious detrimental effect on the ability to heal, cope and maintain a positive quality of life. This is becoming increasingly clear in the case of neurodegenerative diseases. Neurodegenerative diseases involve the devastating loss of cognitive and motor function which is stressful in itself, but can also disrupt neural circuits that mediate stress responses. Disrupting these circuits produces aberrant emotional and aggressive behavior that causes long-term care to be

especially difficult. In addition, added stress drives progression of the disease and can exacerbate symptoms.[5]

Additionally, the effects of the aggressive behaviors associated with Alzheimer's Disease can greatly impact both Mr. Abrams' experience if incarcerated, as well as pose tremendous burdens on the facilities associated with his potential incarceration. In "Aggressive Behaviors in Alzheimer Disease and Mild Cognitive Impairment: Systematic Review and Meta-Analysis"[6] the authors conclude that:

> Evidence increasingly suggests elevated risk of exhibiting aggressive behaviors in Alzheimer disease (AD) and mild cognitive impairment (MCI). Such aggressive behaviors are among the most frequent and disruptive behavioral complications of cognitive decline contributing to increased cost of care, hospitalization, caregiver burden, and risk of premature institutionalization. Aggressive behaviors in these conditions are associated with medication use and physical restraint. Antipsychotic use is of limited effectiveness and is associated with potentially harmful side effects, such as increased risk of stroke and death. Physical restraint has been associated with a multitude of adverse psychological and physical effects.

---

[5] This article suggests that – in addition to the profound effect that a custodial sentence could have on his life itself -- it may also explain Mr. Abrams' strange and bizarrely aggressive behavior exhibited while testifying.

[6] Yu R, Topiwala A, Jacoby R, Fazel S. "Aggressive Behaviors in Alzheimer Disease and Mild Cognitive Impairment: Systematic Review and Meta-Analysis. Am J Geriatr Psychiatry". March 2019 (available from the National Library of Medicine at https://pmc.ncbi.nlm.nih.gov/articles/PMC6399100) (last accessed July 20, 2025)

11
SENTENCING POSITION PAPER

Section 3553(a)(1) explicitly requires courts to consider "the history and characteristics of the defendant". Section 3553(a)(2)(D) (*emphasis added*) further highlights the need to provide the defendant with "needed educational or vocational training, *medical care*, or other correctional treatment in the most effective manner".[7] It is certain that Mr. Abrams is more likely to receive the medical attention he needs at his home and under the care of his family. The finances and capacity of the Bureau of Prisons at present are strained as it comes to

---

[7] Additionally, a sentence that takes into consideration Mr. Abrams' mental and physical ailments comports with the issues that could be addressed post-sentence in a motion for compassionate release pursuant to USSG §1B1.13, which provides as follows in relevant part (*emphasis added*):

> (a) In General.—Upon motion of … the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that… extraordinary and compelling reasons warrant the reduction.
> (b) …Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof
>> (1) Medical Circumstances of the Defendant.—
>>> (A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). *A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.* Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

providing medical care for inmates. In an article recently published by U.S. News and World Report, the journal stated that they had obtained BOP documents stating that "the Bureau of Prisons said the BOP was taking 'decisive and strategic action' to address 'significant challenges, including a critical staffing shortage, crumbling infrastructure and limited budgetary resources.'" (Sisak, Michael R. and Balsamo, Michael, "The US Government Is Closing A Women's Prison And Other Facilities After Years Of Abuse And Decay", U.S. News and World Report (December 24, 2025). And these hardships are only bound to increase now that the BOP are housing ICE detainees. (Sisak, Michael, "Federal Prisons, Plagued With 'A Critical Staffing Shortage, Crumbling Infrastructure And Limited Budgetary Resources,' Are Being Used For Trump's Immigration Crackdown", Fortune Magazine (February 11, 2025).

     Mr. Abrams is a 75-year-old man of little means and major physical and mental health infirmaries. His oldest living sibling has made it to the age of 75 – when the majority of his siblings passed long before that age. He relies on the care and support of his family and partner to complete the simplest of tasks, which include providing for his medical care.

     Additionally, with the progression of his dementia, it is uncertain that Mr. Abrams would, at times, understand *why* he is incarcerated, undermining the punitive goals of Section 3553(a).

XI. **A PROBATIONARY SENTENCE SATISIFES THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a)**

a. *A Probationary Sentence Reflects The Seriousness Of The Offense, Promotes Respect For The Law, Provides Just Punishment And Is An Adequate Deterrence To Criminal Conduct*

Mr. Abrams has come to understand the malevolence of his conduct and that a substantial punishment is warranted. At present, his freedoms are limited to attending to his medical needs, attending (at times) family gatherings, and, when possible, religious services. For a man of his age and in his condition, a Probationary Sentence is sufficient. It remains a severe punishment, and he will not (and cannot) commit further criminal conduct (and has not since 2018 when he learned that this investigation was undertaken).

b. *A Probationary Sentence Is Sufficient To Protect The Public From Further Crimes*

Considering Mr. Abrams' awareness of his misdeeds and their impact, and in further consideration of his physical and mental health, there is no chance that he will re-offend.

XII. **CONCLUSION**

For the reasons set forth above, Mr. Abrams respectfully asks the Court to enter a probationary sentence.

Should the Court determine that a custodial sentence is necessary (which the undersigned counsel does not believe), for a man of his age, resources, physical and mental state, and little capacity to take part in life, a sentence of 12 months of

home confinement followed by 12 months of supervised release is otherwise appropriate.

Respectfully submitted,

Date:   July 21, 2025                    LAW OFFICE OF IAN WALLACH, PC


                                         By    */s/ Ian Wallach*
                                                IAN WALLACH
                                                *Attorney for Defendant*,
                                                Percy Abrams

# DECLARATION

I, Ian Wallach, hereby state and swear as follows:

1. I am counsel to Percy Abrams in this matter, having been appointed under the CJA.

2. In a separate matter I worked on in 2022, the Court received an email in a separate matter (that is filed under seal because of privacy concerns), the Court was informed that the Bureau of Prisons had only one forensic psychologist in its employ, and that he was employed at Butner, and there was a nine-month waiting list for a competency evaluation. Specifically, Dia Boutwell, Ph.D. and member of the American Board of Professional Psychology, sent an email to the CRD in that matter stating "We do not currently have the resources to complete a psychiatric examination. Our only forensic psychiatrist after the end of this month will be at Butner. If they want a BOP psychiatric exam, it will be a nine-month wait to get into FMC Butner. I would strongly recommend this evaluation be completed by a community psychiatrist if that is what is required." Should the Court or Government request, I will provide the name of that case under seal (as it is sealed due to the mental health issues of the client). Because of current budget issues, I was not able to secure an expert to further evaluate Mr. Abrams' mental state.

3. As counsel for the Government will affirm, the diminishment of Mr. Abrams' mental faculties was frequently brought to the attention of the Court and Government, and the undersigned counsel repeatedly requested

that the Government take pre-trial depositions of Mr. Abrams pursuant to Fed. R. Crim. Proc. R. 15.

Dated: July 21, 2025

                                                          */s/ Ian Wallach*
                                                         IAN WALLACH